1   Jeffrey W. Shields, Bar No. 109920
    Rick A. Varner, Bar No. 160403
2   Michael W. Buhrley, Bar No. 255203
    SHIELDS LAW OFFICES
3   1920 Main Street, Suite 1080
    Irvine, California 92614
4   (949) 724-7900; Fax (949) 724-7905
    E-mail: jeff@shieldslawoffices.com
5
6   Attorneys For Defendants
    National Vending Systems, Inc., Mad Dog Energy
7   Products, Inc., Richard Black, Gary Luckner,
    Michael Stein And Mel Hendrix
8
9                   UNITED STATES DISTRICT COURT

10                 CENTRAL DISTRICT OF CALIFORNIA

11             EASTERN DIVISION – RIVERSIDE COURTHOUSE

12

13  WOODARD INVESTMENTS, INC. an          Case No. EDCV 08-01805 SGL (MANx)
    Oregon corporation, and KEITH
14  WOODARD, an individual,               DEFENDANTS' REPLY TO PLAINTIFFS'
                                          OPPOSITION TO MOTION TO SET ASIDE
15          Plaintiffs,                   RIGHT TO ATTACH ORDERS, QUASH
                                          WRITS OF ATTACHMENT AND RELEASE
16          vs.                           PROPERTY LEVIED UPON

17  NATIONAL VENDING SYSTEMS,             [Memorandum Of Points And
    INC., a California                    Authorities Attached Hereto,
18  corporation; MAD DOG ENERGY           Supplemental Declaration Of
    PRODUCTS, INC., a California           Richard Allen Black And
19  corporation; RICHARD BLACK, an        Objections To And Motion To
    individual; GARY LUCKNER, an          Strike Portions Of Plaintiffs'
20  individual; MICHAEL STEIN, an         Opposition Evidence Submitted
    individual; MEL HENDRIX, an           Concurrently Herewith]
21  individual; and RICHARD ALLEN,
    an individual,
22
23          Defendants.

24                                        Date:       August 18, 2009
                                          Time:       10:00 a.m.
25                                        Courtroom:  580
                                                      Roybal Federal Bldg.
26                                                    255 E. Temple St.
                                                      Los Angeles, CA 90012
27

28

19224

**TABLE OF CONTENTS**

Page

I. PRELIMINARY STATEMENT ...............................1

II. ARGUMENT ...........................................2

    A. Plaintiffs Have Failed To Establish The "Probable Validity" Of Their Breach Of Contract Claims – All Of Which Are Based On Alleged "False Validations" Ante-Dating The Master Distributor Agreement. .........................2

        1. The Master Distributor Agreement Expressly States That There Were No Earnings Claims And Any Prior Representations Were Of No Effect. .................................2

        2. Plaintiffs' "Reasonable Expectations" Could Not Have Been "Frustrated" As Alleged. ..................................4

    B. Plaintiffs Have Also Failed To Show The Probable Validity Of Their Breach Of Contract Claims Based On Alleged Offers To Sell "Exclusive Territories" To Others. ..............6

        1. Woodard Only Purchased Exclusive Master Distributor Rights To Sell Products. ........6

        2. Plaintiffs' Claim That Defendants Purportedly Offered To Sell The Same Exclusive Territories Is Not Supported By Admissible Evidence. ....................8

    C. The SAMP Law Does Not "Apply" In This Case Nor Does It "Imply" Any Additional Terms Into The Master Distributor Agreement. ...............9

    D. The Washington Business Opportunity Law Also Does Not "Apply" And Does Not "Imply" Any Additional Terms. .........................11

    E. Plaintiffs' Money Had And Received Claim Also Lacks Any Probable Validity. ..............12

III. CONCLUSION ........................................12

i

2329

## TABLE OF AUTHORITIES

**Cases**                                                        **Page(s)**

Price v. Wells Fargo Bank
    (1989) 213 Cal.App.3d 465, 261 Cal.Rptr. 735..............4

Trauann v. Southland Corporation
    842 F.Supp. 386, (1993)...................................4

**Statutes**

California Civil Code § 1812.201(a).......................10

California Civil Code § 1812.201(b).......................11

California Code of Civil Procedure § 483.010..............2

1  MEMORANDUM OF POINTS AND AUTHORITIES

2  I.    PRELIMINARY STATEMENT

3  Plaintiffs' Opposition to Defendants' "Motion To Set

4  Aside Attachment, Etc." (the "Motion") actually underscores why the

5  attachment obtained by Plaintiffs (the "Attachment") should be set

6  aside.

7  Fundamentally, in order to have a proper attachment, a

8  plaintiff needs to establish, *inter alia*, the probable validity of

9  its breach of contract claim. That has not been done here.

10  To the contrary, as demonstrated in the Motion and

11  impliedly confirmed in the Opposition, there has been no breach of

12  any term of the Master Distributor Agreement by Defendants

13  whatsoever, and the so called terms which Plaintiffs ask the Court

14  to "imply" into that contract are, in fact, contradicted by the

15  express terms of the Master Distributor Agreement itself.

16  Thus, in a misguided attempt to try to establish the

17  necessary breach of contract claim, Plaintiffs are actually asking

18  this Court to ignore the express terms of that contract, and,

19  instead, to improperly rely on parol evidence which is wholly

20  barred by the express integration clause of that contract.

21  In essence, Plaintiffs are wrongly asking this Court to

22  re-write the express terms of the Master Distributor Agreement.

23  Among other things, the Opposition glaringly fails to

24  refute all of the following salient points evidenced in the Motion:

25  •    The express no earnings claims and no buy-back

26  clauses of the Master Distributor Agreement;

27  •    The express integration clause of the Master

28  Distributor Agreement;

1

1    •    The parol evidence nature and inadmissibility of the

2    vast majority of Plaintiffs' supposed evidence; and

3    •    Plaintiffs' rejection of any purported "offer to

4    sell" which might arguably qualify as a SAMP and, instead,

5    Plaintiffs' entry into multiple written contracts – all in excess

6    of $50,000 which clearly do <u>not</u> qualify as a SAMP.

7    For all of the reasons detailed below, and in the

8    Motion, Plaintiffs have failed to show the probable validity of

9    their contract claims and the Motion should be granted.[1]

10    II.    ARGUMENT

11    A.    <u>Plaintiffs Have Failed To Establish The "Probable</u>

12        <u>Validity" Of Their Breach Of Contract Claims – All</u>

13        <u>Of Which Are Based On Alleged "False Validations"</u>

14        <u>Ante-Dating The Master Distributor Agreement</u>.

15    Plaintiffs attempt to justify the Attachment by arguing

16    that Defendants supposedly breached the covenant of good faith and

17    fair dealing implied in the Master Distributor Agreement because

18    Plaintiffs supposedly relied on a number of alleged "false

19    validations". This argument is <u>without any merit</u>.

20        1.    <u>The Master Distributor Agreement Expressly</u>

21            <u>States That There Were No Earnings Claims And</u>

22            <u>Any Prior Representations Were Of No Effect</u>.

23    ──────────────────

24    [1]    Additionally, as set forth in the Motion, in light of
    Plaintiffs' complete failure to account for their sales of machines
25    and products, or profits therefrom, and continued role in
    distributing the subject products, their alleged damages are not
26    "fixed or readily ascertainable" as required by California Code of
    Civil Procedure section 483.010.
27        Furthermore, Plaintiffs have offered nothing but their own
    self-serving denials to refute that they are pursuing the
28    Attachment for the improper purpose of putting Defendants out of
    business – as they threatened to do both verbally and in writing.

Although the Opposition completely fails to refute the express written language of the Master Distributor Agreement upon which Plaintiffs' Attachment is based, the fact remains that the Master Distributor Agreement contains very express language limiting Plaintiffs' ability to claim or justifiably rely on any prior representations.

Among other things, the Master Distributor Agreement states in bold-faced type that:

> "**11. No Earnings Claims.  It is <u>acknowledged</u> that Supplier has made <u>no</u> guarantees, or estimates, of Master Distributor's Earnings, or ranges of earnings.**"  [Bold in original, other emph. added; Master Distributor Agreement, p. 3, ¶ 11.]

Similarly, the Master Distributor Agreement states that it is the "<u>sole and only Agreement of the parties</u>" and that:

> "<u>Any prior agreements, promises, negotiations, or representations concerning its subject matter not expressly set forth in this Agreement are of no force or effect</u>." [Emph. added.]

Now, in complete <u>conflict</u> with such specific language, Plaintiffs try to claim that they supposedly <u>relied</u> on prior representations and "false validations" <u>ante-dating</u> the Master Distributor Agreement.

Specifically, the Opposition asserts that Mr. Stein, Mr. Hendrix and Mr. Black allegedly "lied" about "their supposed successes" which "<u>convinced Woodard to invest in a distributorship of his own</u>". [Emph. added; Opposition, p. 9, line 25 to p. 10, line 8.]

3

1    Then, in a nonsensical attempt to spin both facts and
2 law, the Opposition states that these prior "lies" frustrated "the
3 very purpose for which Woodard invested in the business
4 opportunity" and, therefore, allegedly "do not implicate the parol
5 evidence rule, and are not hearsay". [Opposition, p. 12, lines 18-
6 21.]

7    Plaintiffs are seriously mistaken.  The Master
8 Distributor Agreement – signed by Plaintiffs and governing their
9 relationship – expressly states that there were <u>no earnings</u>
10 <u>representations whatsoever</u>.  Yet, Plaintiffs' breach of contract
11 claims are entirely based on the alleged existence of such prior
12 "false validations" and "lies" regarding <u>earnings</u>.

13    Spin it as they may, however, <u>as a matter law</u> any
14 evidence of an alleged false promise relating to a matter covered
15 in the written Master Distributor Agreement which directly
16 contradicts the terms thereof is parol evidence and is
17 <u>inadmissible</u>.[2]

18    2. <u>Plaintiffs' "Reasonable Expectations" Could Not</u>
19       <u>Have Been "Frustrated" As Alleged</u>.

20    Plaintiffs' claim that their "reasonable expectations"
21 were supposedly frustrated by "false validations" is also patently

22

23 [2]  Moreover, any supposed support of such evidence (*i.e.*, the
    Biethman Dec., Koepsell Dec., Rogers Dec. and Vitt Dec.) is also
24 inadmissible hearsay and/or entirely irrelevant.
       As set forth in <u>Traumann v. Southland Corporation</u>, 842 F.Supp.
25 386, 391 (1993) (*citing*, <u>Price v. Wells Fargo Bank</u> (1989) 213
    Cal.App.3d 465, 484, 261 Cal.Rptr. 735):
26       "Under California Law, 'if the false promise relates to
27       the matter covered by the main agreement and contradicts
          or varies the terms thereof, <u>any evidence of the false</u>
28       <u>promise directly violates the parol evidence rule and is</u>
          <u>inadmissible.</u>'" [Emph. added.]

4

1  unjustifiable for at least the following reasons:

2      •    The alleged "false validations" purportedly occurred

3  in September 2007 - three months prior to Plaintiffs' executing the

4  Master Distributor Agreement [Supp. Woodard Dec., ¶'s 5-6];

5      •    The alleged "false validations" occurred before

6  Plaintiffs entered into the First Purchase Agreement and the Second

7  Purchase Agreement for the master distributor rights to Oregon and

8  Washington - each of which preceded the December 2007 Master

9  Distributor Agreement;[3]

10      •    Plaintiffs terminated the Master Distributor

11  Agreement by their July 11, 2008 letter, proclaiming "Let this

12  correspondence serve as Woodard's election to cancel and rescind

13  the Agreement" [Emph. added; Black Dec., ¶ 46; Plaintiffs' Request

14  for Judicial Notice, Court Document "76", p. 139 (i.e., Exh. "9" to

15  Attachment Papers), third paragraph]; and

16      •    Plaintiffs allegedly did not discover "Mr. Black's

17  deception" and "problems with Vroom's and Mad Dog's business

18  relationship" until September 2008 — a full two months after their

19  July 2008 termination of the Master Distributor Agreement. [Supp.

20  Woodard Dec., ¶ 4, p. 1, line 27 to p. 2, line 2; ¶ 15 and ¶ 16, p.

21  5, lines 14 to 17].[4]

22

23  [3]    Each of these agreements expressly stated that there were "no
    estimates and/or guarantee of earnings", "no buy-back" protection,
24  and that each agreement "supersedes any previous agreement, written
    and oral and is the entire agreement between the Purchaser and
25  Seller". [Defendants' Exh., "1", ¶'s 9 and 10, and signature page;
    Defendants' Exh. "4", ¶'s 9 and 10, and signature page.]
26  [4]    In this regard, Mr. Woodard declares "I was not aware of Mr.
27  Black's deception until September, 2008" [Supp. Woodard Dec., ¶ 4,
    lines 27-28] and "I did not even know that there were problems with
28  Vroom's and Mad Dog's business relationship until September 12,
    2008". [Emph. added; Supp. Woodard Dec., ¶ 16, p. 5, lines 14-17.]

1    Thus, the alleged "false validations" could not have been

2    reasonably relied upon with respect to entering into the Master

3    Distributor Agreement.   Nor could they have frustrated Plaintiffs'

4    "reasonable expectations" or caused him "to question [his] ability

5    to ethically serve as a master distributor" - the Master

6    Distributor Agreement was already terminated!

7    B.    Plaintiffs Have Also Failed To Show The Probable

8          Validity Of Their Breach Of Contract Claims Based On

9          Alleged Offers To Sell "Exclusive Territories" To

10         Others.

11   Plaintiffs allege that Defendants supposedly breached the

12   covenant of good faith and fair dealing by allegedly offering to

13   sell to others "exclusive territories" within Plaintiffs' Oregon

14   and Idaho exclusive Master Distributor territories.   However, none

15   of these conclusory claims withstands scrutiny.

16         1.    Woodard Only Purchased Exclusive Master

17               Distributor Rights To Sell Products.

18   Plaintiffs set up their alleged second breach of the

19   Master Distributor claim by confusingly asserting that Plaintiffs

20   purchased both (1) the exclusive lower-level distributor rights to

21   place machines, and (2) the exclusive Master Distributor rights to

22   supply the Buzz Bite Products to the lower-level distributors

23   within the Oregon, Washington and Idaho territories. [Supp. Woodard

24   Dec., ¶ 6; Opposition, p. 8, lines 7-16.]   This statement is

25   patently misleading.

26         To begin with, the Master Distributor Agreement covered

27   only Plaintiffs' right to be the exclusive master distributor of

28   the Buzz Bites Products in the Oregon, Washington and Idaho areas

6

1 | to lower-level distributors who operated within such territories.

2 |        In this regard, paragraph 1 of the Master Distributor

3 | Agreement specifically states as follows:

4 |        "1. Exclusive Appointment. The Supplier [*i.e.*, NVS]

5 |        hereby appoints the Master Distributor [*i.e.*,

6 |        Plaintiffs] as the exclusive distributor <u>for the</u>

7 |        <u>sale of the Products</u> within the following territory:

8 |        The States of Idaho, Oregon, and Washington.

9 |        (Hereinafter the "Territory") For so long as this

10 |        Agreement is in operation, the Supplier shall not

11 |        appoint any other or different person, firm,

12 |        corporation or entity <u>to sell the Products</u> in the

13 |        Territory." [Emph. added; Defendants' Exh. "7",

14 |        Master Distributor Agreement, p. 1, ¶ 1.]

15 |        As defined in Exhibit "A" to the Master Distributor

16 | Agreement, the "Products" are <u>only</u> the "Buzz Bites" and "Foosh

17 | Mints" candies — <u>not</u> the machines from which they are sold.

18 |        While Plaintiffs also purchased machines to place

19 | themselves, they did <u>not</u> purchase any exclusive rights to be the

20 | sole or exclusive machine operators in the subject territories.

21 |        <u>To the contrary</u>, the Master Distributor Agreement

22 | expressly contemplates the existence of other lower-level

23 | distributors who would become the <u>customers of Plaintiffs</u>.[5]

24 | [5]   For example, paragraph 5(b) of the Master Distributor Agreement

25 | requires that Plaintiffs "must maintain inventory adequate to supply <u>all sub-distributors in the Master Distributor's Territory</u>".

26 | Similarly, paragraph 10 provides that "To assist the Master Distributor, the Supplier shall identify <u>potential customers</u> who

27 | are in the Master Distributor's Territory and are known to the Supplier", so Plaintiffs could resell the product at a $0.03 per

28 | candy profit. [Emph.add.; ¶ 8.]  This is exactly what Defendants did — they referred the sub-distributors within the subject

1  Indeed, the Opposition concedes as much when it states that: "In

2  Woodard's case, for example, Woodard, as a master distributor, had

3  purchased the exclusive right to supply Buzz Bites <u>to all of the</u>

4  <u>Buzz Bites distributors</u> in Oregon, Washington and Idaho – his

5  exclusive territories". [Emph. Added.; Opp., p. 8, lines 13-16.][6]

6          2.   <u>Plaintiffs' Claim That Defendants Purportedly</u>

7               <u>Offered To Sell The Same Exclusive Territories</u>

8               <u>Is Not Supported By Admissible Evidence.</u>

9          Plaintiffs claim that, in April 2008, some unnamed and

10 unidentified woman telephoned Mr. Woodard supposedly stating that

11 Defendants had offered to sell her "an 'exclusive' territory in

12 Oregon".  From this hearsay statement, Mr. Woodard purportedly

13 <u>inferred</u> that "Mad Dog was selling the same 'exclusive territories

14 in Oregon to multiple distributors". [Opposition, p. 8, lines 17-

15 23; Woodard Dec., ¶'s 30-31.][7]

16         As set forth in the Motion, the purported statements by

17 this unidentified woman are <u>inadmissible hearsay</u>.  Indeed, the

18 inference supposedly made therefrom is necessarily based on

19 territories to Plaintiffs so that Plaintiffs could then exclusively
20 supply Products to them to stock their machines. [Black Dec., ¶ 43;
   Defendants' Exh. 14.]

21 [6]  The Master Distributor Agreement contains <u>no</u> representations or
22 covenants that Defendants were the only ones authorized to sell
   vending machines from which the subject products could be sold or
23 that Defendants were the only ones selling, or authorized to sell,
   sub-distributor territories for placement of such machines.  Nor
   can such terms be implied.

24 [7]  Aside from the fact that the Opposition is confusingly vague
25 as to what kind of "exclusive territory" was supposedly offered, it
   certainly was not Plaintiffs' exclusive "Master Distributor"
26 territory for Products governed by the Master Distributor
   Agreement.  Rather, the allegation must refer to a sub-distributor
27 territory for machine placement because <u>Mr. Woodard</u> declared that
   Mr. Luckner "left a voicemail message with me <u>notifying me</u> that a
28 woman <u>in my territory</u> of Oregon <u>would be phoning me</u> about investing
   in the Buzz Bites Opportunity". [Emph. add.; Woodard Dec., ¶ 30.]

1  multiple hearsay, lacks foundation, and is inadmissible.

2      It is particularly telling as to the unreliability of

3  such purported statements that Plaintiffs have not produced with

4  their Opposition any declaration by this woman of her supposed

5  discussions with Defendants or anyone else purportedly previously

6  owning the same territory offered to her.[8]

7      C.  The SAMP Law Does Not "Apply" In This Case Nor Does

8          It "Imply" Any Additional Terms Into The Master

9          Distributor Agreement.

10     Plaintiffs argue that Defendants breached the implied

11  covenant of good faith and fair dealing by allegedly breaching

12

13  [8]   Plaintiffs also make an unsupported leap of logic that Mr.
Black's alleged statement that "Mad Dog could not control third

14  parties from selling into my Exclusive Territory" is supposedly an
"adoptive admission" that Defendants were actually wrongfully

15  selling the same "exclusive territories" to multiple sub-
distributors, and breaching the implied covenant of good faith and

16  fair dealing in the Master Distributor Agreement.
        This is nonsense.  Mr. Black's alleged statement, at best,

17  merely reflects the industry reality that other companies were
selling the vending machines from which the Buzz Bite Products

18  could be sold and Mad Dog could not control other companies.
        No matter who the sub-distributors bought their machines from,

19  however, they still had to buy the Products themselves from

20  Plaintiffs - this is hardly a breach of the implied covenant of
good faith and fair dealing, much less an adoptive admission that

21  the same sub-distributor territories were being sold to multiple
people.

22      Moreover, the Biethman Dec. does nothing to support
Plaintiffs' claims in this regard.  Mrs. Biethman admittedly

23  purchased her machines from American Vending Systems - not from
Defendants.  No matter who raised the concept of her purchasing

24  master distributor rights to Idaho, she expressly acknowledges that
Mr. Black "explained that another distributor named "Keith" [i.e.,

25  Mr. Woodard] currently owned the exclusive [Master Distributor]
right to Idaho, but that he would be more than happy to contact

26  "Keith" and offer to trade him the Idaho territory for territories
in Northern California or elsewhere". [Biethman Dec., ¶ 4.]

27      Obviously, even assuming, arguendo, that this conversation

28  took place, there is nothing in it that could be construed as a
breach of the Master Distributor Agreement or its implied covenant.

1  additional terms supposedly "implied" by California's Seller

2  Assisted Marketing Plan ("SAMP") law.  This argument has no merit.

3          To begin with, Plaintiffs are not suing on any "offer to

4  sell" a SAMP, but on an actual executed Master Distributor

5  Agreement that required an "initial payment" of $300,000 – well in

6  excess of the $50,000 definitional limit for a SAMP.

7          Plaintiffs disingenuously ignore the undisputed fact that

8  they did not accept any "offer" contained in the September 2007

9  Marketing Materials that possibly could be construed as a SAMP.[9]

10          Instead, Plaintiffs entered into – not just one, but

11  three – written agreements over a three month period.

12          In this regard, Plaintiffs entered into: (1) the First

13  Purchase Agreement requiring an "initial payment" of $96,480 for

14  Oregon; (2) the Second Purchase Agreement requiring an "initial

15  payment" of $150,000 for Washington; and (3) the Master Distributor

16  Agreement requiring an initial payment of $300,000 for the Oregon,

17  Washington and Idaho territories and superseded all prior

18  agreements. [Defendants' Exhs. "1", "4" and "7".]

19          Thus, even if, arguendo, the original Marketing Materials

20  included an "offer to sell" which arguably could qualify as a SAMP,

21  Plaintiffs clearly rejected such offer and such rejected offer is

22  not the subject of this lawsuit.  Rather, Plaintiffs chose to enter

23  into multiple agreements that, as a matter of law, were not SAMPs

24  because they required initial payments greater than the

25  definitional maximum of $50,000.[10]

26  9   While Plaintiffs focus solely on the single definitional
    element of "offer to sell", they ignore the other definitional
27  element that a SAMP "requires an initial cash payment of less than
    fifty thousand dollars ($50,000)".  See, Civil Code § 1812.201(a).
28  10   Moreover, even if, arguendo, the First Purchase Agreement

1    Clearly, the SAMP law does <u>not</u> apply and certainly does
2    <u>not</u> "imply" any additional terms into the Master Distributor
3    Agreement.

4    D.    <u>The Washington Business Opportunity Law Also Does</u>
5          <u>Not "Apply" And Does Not "Imply" Any Additional</u>
6          <u>Terms</u>.

7    Notwithstanding the Opposition's concession that "Woodard
8    did not - and does not - contend that Washington law should be
9    applied to his claims for breach of contract and money had and
10   received" [Opp., p. 16, lines 8-10], Plaintiffs nonsensically argue
11   that Washington's business opportunity law supposedly does "imply"
12   additional terms into the Master Distributor Agreement.  This
13   argument directly <u>conflicts</u> with the plain <u>choice of law</u> language
14   contained in the Master Distributor Agreement, which states that:

15       "**Governing Law; Forum**  <u>This Agreement</u>, and any
16       dispute arising out of or related to this Agreement,
17       <u>shall be construed and enforced in accordance with,</u>
18       <u>and governed by, the laws of the State of</u>
19       <u>California</u>". [Emph. added.]

20   Thus, by the parties' <u>express written agreement</u>,
21   Washington law does <u>not</u> "apply" to, or "imply" any terms into, the
22   Master Distributor Agreement.

23

24

25

---

26   could possibly be construed as a SAMP - which it was not - the
     Second Purchase Agreement and the Master Distributor Agreement
27   would still be <u>excluded</u> from the SAMP law because Civil Code
     section 1812.201(b) states that a "'seller assisted marketing plan"
28   shall <u>not</u> include: . . (9) The renewal <u>or extension</u> of an existing
     seller assisted marketing plan contract". [Emphasis added.]

11

1        E.   <u>Plaintiffs' Money Had And Received Claim Also Lacks</u>

2            <u>Any Probable Validity</u>.

3        Plaintiffs argue that the Attachment was supposedly based

4    on Plaintiffs' claim for money had and received, asserting –

5    <u>without any support whatsoever</u> – that "all that remains, is for

6    defendants to repay to Woodard the money that they fraudulently

7    procured, as Woodard demanded on June 11, 2008".

8        Of course, <u>the Master Distributor Agreement did not</u>

9    <u>require Defendants to pay any sum to Plaintiffs</u>.

10       <u>To the contrary</u>, it contained a very express

11   acknowledgement that there was "no buy-back" or "secured investment

12   arrangement" which would serve to protect Plaintiffs from any

13   business losses.  [Defendants' Exh. "7", p. 3, ¶ 12.]  Defendants

14   never agreed to be guarantors of Plaintiffs' business, and there

15   was never any requirement for Defendants to pay any sum to

16   Plaintiffs.

17               III. <u>CONCLUSION</u>

18       For all of the foregoing reasons, and those set forth in

19   the Motion, Defendants respectfully request that the Court grant

20   the Motion in its entirety.

21   DATED:  August //, 2009        Respectfully Submitted,

22                       SHIELDS LAW OFFICES

23

24                       By:_____
                          Jeffrey W. Shields

25                        Rick A. Varner
                          Attorneys for Defendants

26                        National Vending Systems, Inc., Mad
                          Dog Energy Products, Inc., Richard

27                        Black, Gary Luckner, Michael Stein
                          and Mel Hendrix

28

PROOF OF SERVICE

STATE OF CALIFORNIA      )
                         )    ss.
COUNTY OF ORANGE         )

     I, the undersigned, say:  I am employed in the County of Orange, State of California.  I am over the age of 18 years and am not a party to the within action.  My business address is 1920 Main Street, Suite 1080, Irvine, California 92614.

     I served the foregoing documents described as:

**DEFENDANTS' REPLY TO PLAINTIFFS' OPPOSITION TO MOTION TO SET ASIDE RIGHT TO ATTACH ORDERS, QUASH WRITS OF ATTACHMENT AND RELEASE PROPERTY LEVIED UPON**

on the interested parties in this action in the following manners:

**VIA ELECTRONIC ACCESS:**
     I hereby certify that on **August 11, 2009**, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system on the following:

**Jennifer L. Brockett**
**Davis Wright Tremaine LLP**
jenniferbrockett@dwt.com

**David C. Rocker**
**Davis Wright Tremaine LLP**
davidrocker@dwt.com

**VIA OVERNIGHT EXPRESS MAIL**
I deposited such envelope into the Overnight Express Mail at Irvine, California.

**Jennifer L. Brockett**
**DAVIS WRIGHT TREMAINE LLP**
**865 South Figueroa Street, Suite 2400**
**Los Angeles, CA 90017**

**David C. Rocker**
**DAVIS WRIGHT TREMAINE LLP**
**1300 S.W. Fifth Avenue, Suite 2300**
**Portland, OR 97201**

Executed on **August 11, 2009** at Irvine, California.

RICK A. VARNER

18385